Amy COHEN, Eileen Rocchio, Nicole A. Turgeon, Karen A. McDonald, Melissa Kuroda, Lisa C. Stern, Jennifer Hsu, Jennifer E. Cloud, Darcy Shearer, Jody Budge, Megan Hull, Kyle Hackett, Each Individually and on Behalf of all Other Similarly Situated, Plaintiffs,

v.

BROWN UNIVERSITY, Vartan Gregorian, in his Official Capacity as President of Brown University, and David Roach, in his Official Capacity as Athletic Director of Brown University, Defendants.

Civ. A. No. 92–197–P.

United States District Court, D. Rhode Island.

Dec. 22, 1992.

Lynette Labinger, Roney & Labinger, Amato A. DeLuca, Mandell, Goodman, DeLuca & Schwartz, Raymond A. Marcaccio, Blish & Cavanagh, Providence, RI, Arthur H. Bryant, Trial Lawyers for Public Justice, Washington, DC, Herbert B. Newberg, Sandra L. Duggan, Kronfeld, Newberg & Duggan, Philadelphia, PA, for plaintiffs.

Julius C. Michaelson, Jeffrey S. Michaelson, Beverly E. Ledbetter, Providence, RI, for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

### I. *Introduction*

This is a class action lawsuit charging Brown University, its President, and its Athletic Director (collectively "defendants" or "Brown") with discriminating against women in the operation of its intercollegiate athletic program, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"). The plaintiff class consists of all present and future Brown University women students and potential students who participate, seek to participate, and/or are deterred from participating in intercollegiate athletics funded by Brown.

Named plaintiffs include student members of the women's gymnastics and volleyball teams at Brown. For almost twenty years, these two teams were accorded full varsity status. In May 1991, however, Brown reduced these two women's teams, along with two longstanding men's varsity squads, to "intercollegiate club" status.

Plaintiffs charge that Brown's demotion of the two women's teams has undermined their ability to compete in intercollegiate athletics and relegated the members of those teams to "second-class" status. More broadly, plaintiffs allege that Brown's actions have exacerbated the university's discriminatory treatment of women, particularly its continuing failure to provide women with equivalent "opportunities" to participate in intercollegiate athletics.

In two separate Orders, this Court previously granted plaintiffs' motion for class certification and denied defendants' motion to dismiss.[1] Plaintiffs now move for a preliminary injunction. Specifically, they seek a preliminary order: (1) reinstating the women's gymnastics and volleyball teams to full varsity status; and (2) prohibiting Brown from eliminating or reducing the status of any other Brown-funded women's intercollegiate athletic teams unless the percentage of "opportunities" to participate in intercollegiate athletics equals the percentage of women enrolled in the undergraduate program.

The parties presented a total of fourteen days of testimony and twenty witnesses on the preliminary injunction motion. In addition, both sides have filed lengthy pre- and post-hearing briefs. After reviewing all of the evidence, and considering the arguments by both parties, I must grant injunctive relief, as specified at the conclusion of this opinion. Among other things, I direct Brown to immediately restore women's gymnastics and women's volleyball to their former status as fully funded intercollegiate varsity teams and to provide these teams with all of the incidental benefits accorded varsity teams at the university.

This case raises novel issues concerning Title IX and athletic programs. In addition, there is virtually no caselaw on point. For these reasons, I have undertaken to explore at great length the factual and legal context of this case, including a detailed examination of the U.S. Department of Education's official Policy Interpretation of the athletic regulation promulgated under Title IX.

First, I will discuss the varsity athletic program at Brown and the change in status of the four teams. Next, I will outline the legal and regulatory framework for athletic programs under Title IX. Finally, I will address the arguments advanced by both parties under the rubric of this Circuit's well-established preliminary injunction framework, emphasizing what I believe to be the Title IX standards applicable to this case.

## II. *Factual Background*

Brown is a member of Division I of the National Collegiate Athletic Association ("NCAA"), the highest level within the NCAA structure. In academic year 1990–91, Brown funded a total of 31 varsity teams through its athletic department that participated in NCAA and other intercollegiate competition. Of these 31 teams, 16 were for men and 15 were for women. In eleven sports, Brown offered teams for both sexes:

*Men and Women*
(1) Basketball
(2) Crew
(3) Cross–Country
(4) Ice Hockey
(5) Lacrosse
(6) Soccer
(7) Squash
(8) Swimming
(9) Tennis
(10) Fall Track
(11) Spring Track

The remaining sports were confined to either the men's or women's athletic programs. These teams consisted of the following:

| Men | Women |
|---|---|
| (1) Baseball | (1) Field Hockey |
| (2) Football | (2) Gymnastics |
| (3) Golf | (3) Softball |
| (4) Water Polo | (4) Volleyball |
| (5) Wrestling | |

---

1. This Court did, however, dismiss without prejudice plaintiffs' claim against defendant David Roach in his individual capacity.

In 1990–91, there were a total of 894 men and women undergraduates competing on these 31 varsity teams. Of this total, 566 were men (63.3%) men and 328 were women (36.7%). Plaintiffs' Exhibit 3.[2] Records indicate that during this academic year, there were 2951 (52.4%) men and 2683 (47.6%) women enrolled as undergraduates at Brown. Plaintiffs' Exhibit 1.

Nearly all of the men's varsity teams were established before 1927. Baseball was created first in 1869, followed by football in 1878 and track in 1879. The only men's teams established after 1927 were crew in 1961, water polo in 1974 and squash in 1989. By comparison, virtually all of the women's varsity teams were created between 1971 and 1977. The only women's varsity team created after this period was winter track in 1982. Before 1971, all women's sports were operated out of a separate athletic program at Pembroke College, a sub-unit of Brown University until its merger with Brown College during that year. Before the merger, the women's athletic program at Pembroke bore no resemblance to the program which Brown provided to its male varsity athletes. While Pembroke did have a few intercollegiate teams (e.g., field hockey, basketball, tennis), the women's program received very little financial or institutional support from the university.

In May 1991, Brown cut off university funding for, and lowered the status of, 4 of the 31 varsity teams: men's golf, men's water polo, women's gymnastics and women's volleyball. Initially, these teams were dubbed "club varsity," but they were later classified as "intercollegiate club." The parties dispute the exact number of players affected by the demotion. In a pre-trial affidavit, defendant David Roach, Brown's Athletic Director, declared that the change in status affected 58 men and 20 women. Roach Affidavit at ¶ 11. However, in a

memorandum to Brown's Advisory Committee on University Planning ("ACUP") dated April 9, 1991, Mr. Roach stated that the elimination of funding would affect approximately 34 men and 22 women. Plaintiffs' Exhibit 9. Plaintiffs argue that the cut eliminated 37 men and 23 women based upon 1990–91 team sizes reported by Brown to the NCAA. According to plaintiffs' data, the post-demotion totals, in 1991–92, were 529 men (63.4%) and 305 women (36.6%)

The decision to eliminate the four teams from varsity status was apparently made in response to a university-wide directive to cut 5% to 8% from the budget over several years, and at least 3% in the 1991–92 budget. By "unfunding" the four teams, Brown expected to realize a total savings of approximately $77,800 per year. Overall, the athletic department proposed a cut of roughly $115,500, or 2.7% of the department's total budget. Broken down by team, the $77,800 savings from the varsity cuts was apportioned as follows: (a) women's volleyball—$37,127; (b) women's gymnastics—$24,901; (c) men's water polo—$9,250; and (d) men's golf—$6,545. Plaintiffs' Exhibit 9.

After the four teams were reduced in status, they were permitted to participate in intercollegiate competition provided they raise all of their own operating funds from private sources and conform to NCAA and Ivy League rules. As the defendants note, all four teams successfully raised the necessary funds to compete in the 1991–92 and 1992–93 seasons. In addition, all four teams continue to be eligible for post-season tournament and championship events, and receive assistance from Brown in meeting Ivy League and NCAA guidelines for such participation.

Nevertheless, in addition to the elimination of university funding, the four teams

---

**2.** These figures are drawn from a 1991 Gender Equity Study prepared by Brown for the NCAA. According to the Study, there were a total of 541 men and 342 women participating in varsity level competition in 1990–91. However, these numbers included men's and women's fencing, which were treated as "club" sports during that year, not as funded varsity teams. In addition,

the Study did not include members of freshman football, a team that was a fully-funded varsity squad. Thus, as suggested by plaintiffs, I have added an additional 50 men to approximate the freshman football team and omitted the 39 members of the two fencing teams to arrive at the figures stated in the text. These numbers do not include junior varsity participants at Brown.

lost significant privileges in the wake of the demotion. Evidence at the hearing indicates that during the 1991–92 and 1992–93 season, for example, incidents occurred during which varsity teams received priority over intercollegiate clubs in practice time and in access to medical trainers. The university also stripped the coaches of the women's teams of office space, long-distance telephone service and clerical support. Further, the four teams lost "admission preferences" in recruiting freshman. In April 1992, plaintiffs filed suit against Brown.

III. *Legal Framework*

A. Title IX

■ Title IX prohibits gender discrimination in education programs or activities receiving federal financial assistance. The statute provides in relevant part:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ..." 20 U.S.C. § 1681(a).

Plaintiffs assert that Brown receives federal financial assistance, including assistance provided through financial aid. Thus, according to them, the university "is subject to the requirements of Title IX including, *inter alia*, in its intercollegiate athletic program." First Amended Complaint at ¶ 24. Brown acknowledges that it receives federal financial assistance, but at the same time does not admit or deny that its athletic program is covered by Title IX. Answer of Brown University, Vartan Gregorian and David Roach at ¶ 24.

Before 1988, it is possible that Brown's athletic program would have been outside the grasp of Title IX. In *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), the U.S. Supreme Court narrowly construed the phrases "program or activity" contained in the Title IX statute. In that case, the Court *did* hold that federal student aid monies flowing to students at Grove City College subjected the school's entire financial aid office to the dictates of Title IX. However, the Court also concluded that the "assumption that Title IX applies to programs receiving a larger share of a school's own limited resources as a result of federal assistance earmarked for use elsewhere within the institution is inconsistent with the program-specific nature of the statute." 465 U.S. at 572, 104 S.Ct. at 1221. Thus, the receipt of federal financial aid by students at the college did "not trigger institution-wide coverage under Title IX." *Id.* at 573, 104 S.Ct. at 1221.

In an effort to overturn the *Grove City* decision, Congress passed the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, 102 Stat. 28 (1988). In its findings, Congress stated that "legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application" of four major civil rights acts: Title IX; Section 504 of the Rehabilitation Act of 1973; the Age Discrimination Act of 1975; and Title VI of the Civil Rights Act of 1964. Pub.L. No. 100–259, § 2, 102 Stat. 28. To accomplish this goal, the Civil Rights Restoration Act explicitly defined the phrase "program or activity" and "program" in Title IX and the three other civil rights statutes "to make clear that discrimination is prohibited throughout entire agencies or institutions if any part receives Federal financial assistance." S.Rep. No. 64, 100th Cong., 2d Sess. 4, *reprinted in* 1988 U.S.Code Cong. & Ad.News pp. 3, 6.

Section 908 pp. 3, of the amended Title IX now reads:

> For the purposes of this chapter, the term [sic] "program or activity" and "program" mean all of the operations of—
>
>     \*    \*    \*    \*    \*    \*
>
> (2)(A) a college, university, or other postsecondary institution, or a public system of higher education ...
>
>     \*    \*    \*    \*    \*    \*
>
> any part of which is extended Federal financial assistance ...

20 U.S.C. § 1687.

Under this definition, the receipt of federal financial assistance by any segment of

a school, or any student, would bind the entire school to the requirements of Title IX. *See Radcliff v. Landau,* 883 F.2d 1481, 1483 (1989), *clarified,* 892 F.2d 51 (1989), *affirmed after remand,* 930 F.2d 29 (9th Cir.1991) (interpreting Title VI). Given that Brown admits receiving Federal financial assistance, this Court concludes that the university as a whole, including its athletic department, is subject to Title IX.

### B. Athletics Regulation

Under Title IX, the U.S. Department of Education has promulgated regulations governing the administration of programs that receive federal funding. One particular regulation relates to athletic programs, and is codified at 34 C.F.R. § 106.37(c) and § 106.41. The first part of this regulation addresses athletic scholarship offered for "interscholastic or intercollegiate athletics." § 106.37(c). The chief goal of this segment of the regulation is to ensure that scholarship monies are awarded in proportion to the number of students of each sex participating in athletic programs.

The second component of the regulation is broader in scope, encompassing "any interscholastic, intercollegiate, club or intramural" athletic program offered by an institution. 34 C.F.R. § 106.41(a). This part of the regulation addresses the issue of "equal opportunity" between the sexes, the critical issue in the case at hand. The pertinent section reads in full:

> (c) *Equal Opportunity.* A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
>
> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
>
> (2) The provision of equipment and supplies;
>
> (3) Scheduling of games and practice time;
>
> (4) Travel and per diem allowance;
>
> (5) Opportunity to receive coaching and academic tutoring;
>
> (6) Assignment and compensation of coaches and tutors;
>
> (7) Provision of locker rooms, practice and competitive facilities;
>
> (8) Provision of medical and training facilities and services;
>
> (9) Provision of housing and dining facilities and services;
>
> (10) Publicity
>
> Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute non-compliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

34 C.F.R. § 106.41(c).

### C. Official Policy Interpretation

The Office for Civil Rights of the U.S. Department of Education is charged with enforcement of Title IX. In 1979, this Office published in the Federal Register an official "Policy Interpretation" of the "intercollegiate athletic provisions" of Title IX and its implementing regulation. 44 Fed. Reg. 71413. (December 11, 1979).[3] The eleven-page document states that its purpose is to: "clarif[y] the obligations which recipients of Federal aid have under Title IX to provide equal opportunities in athletic programs. In particular, this Policy Interpretation provides a means to assess an institution's compliance with the equal opportunity requirements of the regulation which are set forth at [34 C.F.R. § 106.-37(c) and § 106.41(c)]." 44 Fed.Reg. at 71415.

To help elucidate the meaning of "equal opportunity," the Policy Interpretation is divided into three sections. The first sec-

---

**3.** At the time the Policy Interpretation was published, the Office of Civil Rights was part of the Department of Health, Education, and Welfare.

tion focuses on the specific provision dealing with athletic scholarship contained in 34 C.F.R. § 106.37(c). The second section addresses elements (2) through (9) listed in § 106.41(c). This second section of the Policy Interpretation raises two additional criteria to be examined in athletic programs: (a) recruitment and (b) support services. The third and final section solely discusses the first element listed in § 106.41(c) pertaining to the effective accommodation of student interests and abilities.

Within each of these three areas, the Policy Interpretation provides specific questions and criteria for evaluating athletic programs. On a general note, the Policy Interpretation states that it is "designed specifically for intercollegiate athletics," but that its "general principles" are applicable to interscholastic, club and intramural athletic programs. 44 Fed.Reg. at 71413 It also declares that "club teams" under the Policy Interpretation "will not be considered to be intercollegiate teams except in those instances where they regularly participate in varsity competition." *Id.* at 71413 n. 1.

#### D. Athletics Investigator's Manual

In 1990, the Office for Civil Rights published a manual to facilitate Title IX investigations of interscholastic and intercollegiate athletic programs. This document—entitled "Title IX Athletics Investigator's Manual: 1990"—provides another layer of guidance for investigators with the Office for Civil Rights in interpreting the Title IX regulation. This Manual was intended to supersede two similar guidance documents issued by the Office for Civil Rights in 1980 and 1982.

For the most part, the 1990 Investigator's Manual tracks the outline of the Policy Interpretation. The Manual devotes separate sections to each of the 13 "program components" listed in the Policy Interpretation. In addition, the Manual underscores the tripartite structure of the Policy Interpretation with respect to these 13 components. As stated above, the three areas are:

(1) athletic scholarships—§ 106.37(c);

(2) the effective accommodation of athletic interests and abilities—§106.41(c)(1);

(3) other athletic benefits and opportunities—§106.41(c)(2)–(10), plus recruitment and support services.

For intercollegiate athletics, the Manual recommends to investigators that all 13 of these program components be examined during an investigation. The Manual recognizes, however, that the Policy Interpretation "permit[s] separate investigations and findings" for these "three major areas." Manual at 7. The Manual further concludes that "[a]n investigation may be limited to less than all three of these major areas where unique circumstances justify limiting a particular investigation to one or two of these major areas." *Id.*

### IV. *Discussion*

In determining a motion for preliminary injunction, the district court must consider four factors:

(1) The likelihood of success on the merits;

(2) The potential for irreparable harm;

(3) A balancing of the relevant equities (most importantly, the hardship to the nonmoving party if the restrainer issues as contrasted with the hardship to the moving party if interim relief is withheld); and

(4) The effect on the public interest of a grant or denial of the restrainer.

*Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991); *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 892 (1st Cir.1988). Of these factors, the First Circuit has regarded likelihood of success as "critical." *Narragansett Indian Tribe*, 934 F.2d at 6; *Public Service Co. v. West Newbury*, 835 F.2d 380, 383 (1st Cir.1987); *Lancor v. Lebanon Housing Authority*, 760 F.2d 361, 362 (1st Cir.1985); *see also El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 498 n. 12 (1st Cir.1992). I will address each component in turn.

A. Likelihood of Success

1. *Arguments of the Parties*

a. Plaintiffs

Plaintiffs allege that the Brown athletic program is in violation of Title IX. They base this claim primarily upon one factor in the "equal opportunity" provision of the Title IX athletics regulation. That factor, spelled out in § 106.41(c)(1), asks "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." Plaintiffs maintain that in evaluating this criteria the Court must apply a three-part test contained in the Policy Interpretation. The test asks:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed.Reg. at 71418. Plaintiffs assert that the answer to all of these questions is "no," and as a result Brown is in violation of Title IX.

As a first step, plaintiffs cite to the disparity of athletic "participation opportunities" available to women in comparison to men. Plaintiffs marshall evidence that at no time since the inception of Title IX has the percentage of women participating in intercollegiate athletics at Brown been substantially equivalent to the percentage of women undergraduates. Plaintiffs' contention assumes, I note, that the number of *participants* in Brown's athletic program accurately reflects the number of participation *opportunities* offered by the university. In a nutshell, plaintiffs claim that Brown has structured its varsity program to provide no more than 39% of the varsity opportunities to women, even though women have consistently comprised approximately 48%–49% of the undergraduate population.

According to plaintiffs, Brown has systematically controlled the number of athletes through its selection of the sports it provides to men and women, the size of the teams it offers, and the quality of the coaches it employs. In addition, they allege that Brown has predetermined the number of women athletes by limiting recruitment dollars for women's teams, as well as by restricting the percentage of admissions preferences given to prospective women varsity athletes.[4] Plaintiffs also note that the Investigator's Manual (at 24) directs investigators, for purposes of evaluating compliance with the first question in the Policy Interpretation's three-part test, to compare the number of male and female *participants* in the athletic program with the numbers of full-time undergraduate students. Hence, in support of their assumption that participation equals opportunities, plaintiffs note that the Manual does not distinguish between participation and participation opportunities.

With respect to the second question in the three-part test, plaintiffs assert that Brown halted its expansion of opportunities for women at least ten years ago without achieving equality. While they concede that Brown embarked on a program to expand opportunities for women in athletics during the 1970s, they complain that

---

**4.** Plaintiffs claim, based on data from Brown's Admission Office, that over the past ten years women have consistently comprised a much lower percentage of the total number of Brown varsity athletic recruits offered admission in relation to men. According to the data, the admissions process produced, on average, approximately 65% admissions of men and 35% admissions of women over the ten year period.

Brown has not added a single women's varsity sport since winter track in 1982.

As to the third question, plaintiffs contend that Brown is not effectively accommodating the interests and abilities of women, at least at the varsity level. In addition to gymnastics and volleyball, plaintiffs argue that there are other women athletes who have the ability to participate on varsity teams, including those students on the fencing, rugby, water polo and sailing "clubs." Plaintiffs also note that Brown specifically rejected a request by the women's fencing team (and men's team) to be elevated to varsity status in 1986 or 1987 and again in 1990. Thus, they conclude, even before the demotion of the four teams in May 1991, Brown failed to meet the third part of the Policy Interpretation's three-pronged test.

Although plaintiffs principally rely upon § 106.41(c)(1) to support their motion, they also assert that there is evidence of Title IX violations in other aspects of Brown's athletic program. Plaintiffs allege that there is inadequate funding for many women's teams, and that significant disparities exist between men and women's teams in the areas of coaching, equipment, publicity and recruitment.[5]

Plaintiffs cite little caselaw to support their claims. One case they do note was recently decided by a U.S. Magistrate Judge in New York. *Cook v. Colgate University*, 802 F.Supp. 737 (N.D.N.Y.1992). In that case, the Magistrate Judge found Colgate University in violation of Title IX because the school had refused four student requests to elevate the women's ice hockey team from a "club" to a varsity team between 1979 and 1988. The court examined several of the ten factors in § 106.41(c) of the athletic regulation (e.g., equipment, locker room facilities, travel allowances, coaching) and scrutinized Colgate's arguments that there was a lack of student interest and ability, and a shortage of funds.

In finding a Title IX violation, the *Cook* court was particularly swayed by the gross inequalities between the women's "club" and the men's varsity ice hockey teams. The Court did not look at any other athletic teams at Colgate, nor did it examine any statistics on the total number of athletic "opportunities" in relation to the percentage of men and women enrolled at the university. The Court simply found what it considered to be inequalities in treatment with respect to the two ice hockey teams. As a result, it ordered Colgate to grant varsity status to the women's ice hockey program starting with the 1993–94 academic year and "to provide equivalent athletic opportunities for the women's ice hockey players in accordance with the law." *Cook* at 751.

A second case cited by plaintiffs, *Favia v. Indiana University of Pennsylvania*, 812 F.Supp. 578 (W.D.Pa.1993), was decided last month by a U.S. District Court judge in Pennsylvania. The facts in *Favia* are strikingly similar to the present case. In August 1991, Indiana University of Pennsylvania ("IUP") announced that the women's gymnastics and field hockey teams, and the men's soccer and tennis teams, were slated for elimination as intercollegiate varsity teams beginning with the 1992–93 season. According to IUP's Athletic Director, the cutbacks were made in response to a directive by the university to reduce their departmental budget. Before the 1991 cutback, IUP had 313 men (62.2%) men and 190 women (37.8%) athletes on its intercollegiate teams. Following the elimination of the four teams, there were roughly 248 men (62.5%) and 149 women (37.5%) varsity athletes. In 1990–91, IUP had 4790 men (44.4%) and 6003 women (55.6%) enrolled as undergraduates.

Women students at IUP brought a class action lawsuit under Title IX and the Fourteenth Amendment to the United States Constitution alleging systemic discrimination on the basis of sex in the university's intercollegiate athletic program. Plaintiffs

---

**5.** Because Brown does not offer athletic scholarships, no evidence was presented by plaintiffs on compliance under § 106.37(c).

sought the reinstatement of the two women's teams and an order prohibiting the university from eliminating further women's teams. In ruling in favor of the plaintiffs, the Court simply applied the three-part test contained in the Policy Interpretation to find IUP in violation of Title IX. The Court found that IUP had "failed to override the proportionality requirement" of the test by failing to show a history of expanding the number of athletic opportunities for women or demonstrating that it had fully and effectively accommodated the interests and abilities of women students. *Favia*, slip op. at 16–17. The Court ordered the immediate restoration of the two women's teams to their former status, with university backing and funding equivalent to that furnished during their last year as a varsity team.

### b. Defendants

Brown advances two main counter arguments to plaintiffs' claims. First, Brown asserts that plaintiffs' reading of Title IX is too simplistic. From Brown's perspective, the Title IX athletic regulation, the Policy Interpretation and the Investigator's Manual contain a complex framework for assessing athletic programs *as a whole.* Thus, in their view, plaintiffs would have to address many more questions and factors before proving a Title IX violation. For example, Brown believes that in assessing "equal opportunity," the Court must not only consider § 106.41(c)(1), but also assess the nine other factors listed in § 106.41(c).

In addition, Brown vehemently disputes plaintiffs' focus on the comparison of the ratio of men and women participating in intercollegiate athletics to their relative ratio in the undergraduate population. From Brown's vantage point, the Title IX statute itself states that it does not require a strict "proportionality" test in assessing violations of the law. In support, they quote the following language contained in 20 U.S.C. § 1681(b):

Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community ...[6]

Brown avers that this provision explicitly recognizes that equal opportunity does not require proportionality. Moreover, Brown contends that this section precludes preferential treatment to members of one sex on account of a disparity that may exist with respect to the other sex. In short, Brown alleges that "Title IX is not an affirmative action statute." Defendant's Post–Hearing Memorandum at 7.

Brown also believes that the plaintiffs' proportionality claim is inconsistent with the athletic regulation's emphasis on accommodating the interests and abilities of both sexes. They argue that it is the interests and abilities of students, not the relative proportion of the sexes, that determines what "participation opportunities" must be offered to each sex. In other words, it is *opportunity,* not *participation,* that is the crucial factor for determining compliance under the regulation. If not, they suggest, then the regulation would have simply required "equal athletic participation."

Further, Brown flatly denies plaintiffs' argument that it has "structured" its athletic program to achieve a set percentage of men and women participants. Joan Taylor, an Associate Athletic Director at Brown, testified that the roughly 60% men to 40% women ratio of varsity athletes at Brown is simply a reflection of the interests and abilities of the students. Brown concludes that "this Court has absolutely

---

**6.** Section 1681(b) continues:

... State, section, or other area: *Provided,* That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical

evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

no evidence upon which it could conclude that the ratio of 'participation opportunities' provided to male and female student athletes is not *substantially* proportionate to the relative population of each sex." Defendant's Post–Hearing Memorandum at 37 (emphasis in original).

Brown's second and related argument is that it *is* effectively accommodating the interests and abilities of its students. Brown notes that its athletic program consists of a wide spectrum of sporting services, including the free use of athletic facilities, physical education classes, intramural sports, club sports and intercollegiate club sports, as well as junior varsity and varsity sports.[7] At all of these levels, Brown asserts, it does not discriminate on the basis of sex, nor does it limit the number of "opportunities" available for either men or women. Brown also boasts that it fields one of the highest number of men's and women's teams to compete at the NCAA or Ivy League level. Thus, according to the defendants, any disparities which exist between the number of men and women varsity athletes is merely a reflection of the varying interests and abilities of the students.

Finally, Brown maintains that the change in status of the four teams is "not legally significant" under Title IX. Post–Hearing Memorandum at 21. Brown notes that those teams continue to compete at an intercollegiate level and that the Policy Interpretation specifically allows "club teams" to be considered "intercollegiate teams" where they "regularly participate in varsity competition." The only change, from Brown's perspective, is a shift in funding status. Alternatively, Brown argues that even if the change of status *was* legally significant, its actions expanded the ratio of men to women in the varsity program because almost twice as many men were affected than women.

**7.** The parties presented little evidence on the full scope of club or intramural programs at Brown. One reason is that club teams are student-run and the Athletic Department apparently does not maintain rosters of these teams. Still, Brown estimates that for the years 1990–91

## 2. Defining The Applicable Standard: Threshold Issues

### a. Policy Interpretation and Investigator's Manual

■ I must state at the outset of my analysis that there are no simple tests to apply in this area. I also recognize that the Policy Interpretation and the unpublished Investigator's Manual do not carry the force of law or establish controlling standards for this Court. Nevertheless, I believe the Policy Interpretation, and to a slightly lesser extent the Investigator's Manual, are important guides in unraveling the requirements of the athletic regulation. Moreover, considerable weight should be given to an agency's interpretation of its own regulation. *Martin v. Occupational Safety and Health Review Commission,* — U.S. ——, ——, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991); *Sprandel v. Secretary of Health and Human Services,* 838 F.2d 23, 25 (1st Cir.1988); *McCuin v. Secretary of Health and Human Services,* 817 F.2d 161, 168 (1st Cir.1987). In addition, given the paucity of caselaw in this area, both parties rely heavily upon the Policy Interpretation and the Investigator's Manual to support their respective arguments. Indeed, to a large extent, the dispute in this case revolves around differing interpretations of these documents.

### b. Can § 106.41(c)(1) Provide A Sole Basis For A Title IX Violation?

■ Even accepting the Policy Interpretation as a starting point, a further threshold determination remains concerning § 106.41(c)(1). The parties dispute, and the Court must determine, the fundamental issue whether a violation of Title IX may be grounded solely upon this sole criteria. The defendants insist that Title IX requires a program-wide analysis to determine compliance. The defendants' strongest support on this point derives from the Investiga-

and 1991–92, there were a total of 12 club sports, including frisbee, cricket, skiing and tae kwan doe. Most of these club teams were coed, with approximately 480 men and women participating.

tor's Manual.[8] The Manual states that "[i]nvestigations of athletics programs are frequently difficult and lengthy, primarily because of the considerable amounts of information that must be collected, analyzed, and evaluated to determine compliance." Manual at 2. The Manual further emphasizes that compliance with Title IX should ordinarily rest upon more than one particular aspect of an athletic program:

> There is no rule or number of disparities that when reached constitutes a violation. Generally, the determination is whether, in reviewing the program as a whole, the disparities add up to a denial of equal opportunity to athletes of one sex.

Manual at 10.

This language is not conclusive. First, as noted above, the Policy Interpretation distinguishes and discusses § 106.41(c)(1) separately from the nine other factors contained in § 106.41(c). Second, the Policy Interpretation states that a finding of noncompliance under § 106.41(c)(1) may be based upon "disparities of a substantial and unjustified nature ... in the institution's program as a whole," or based upon "disparities in ... individual segments of the program [which] are substantial enough in and of themselves to deny equality of athletic opportunity." 44 Fed.Reg. at 71417, 71418. Third, in reference to the Policy Interpretation's three-part framework, the Investigator's Manual itself states on another page that intercollegiate athletic investigations "may be limited to less than all three of these major areas where unique circumstances justify limiting a particular investigation to one or two of these major areas." Manual at 7.

There is little question that this factor is the most important criteria listed in § 106.41(c). In addition, not every institution can be evaluated under all 13 "program components." Brown, for example, does not offer athletic scholarships and thus there is no need to examine compliance under § 106.37(c). In my view, the Policy Interpretation and the Investigator's Manual suggest that Title IX determinations must be flexible to accommodate individual institutions. And both documents indicate that determinations of noncompliance may be limited to § 106.41(c)(1). For all of these reasons, I hold that a finding of violation under Title IX may solely be limited to § 106.41(c)(1).

### 3. *Determining The Applicable Standard Under § 106.41(c)(1)*

The next issue to address is how in fact to determine whether an institution is complying with § 106.41(c)(1). The plaintiffs believe that the Policy Interpretation "provide[s] in pertinent part that compliance with Title IX's requirement of providing equal opportunities to participate in intercollegiate athletics will be evaluated by determining" the answers to the three-part test spelled out in that document. Memorandum In Support of Plaintiffs' Motion For Preliminary Injunction at 6. The defendants disagree. In their view, these three questions only relate to the issue of "levels of competition" within § 106.41(c)(1), and even on this narrow topic the three questions are not dispositive.

At first blush, the defendants have a point. The three-part test appears to be limited to the issue of "levels of competition" within the Policy Interpretation's section on § 106.41(c)(1). But on closer scruti-

---

**8.** For support of their program-wide argument, defendants also refer this Court to a recent decision by a U.S. District Court in New Mexico involving Title IX and athletics. *Arnot v. Ramo,* C.A. No 92–0551 (D.N.M. July 20, 1992) (bench decision). In an oral ruling, Chief Judge Burciaga stated:

> "... I'm concerned that the way the plaintiffs read Title IX, that alone would preclude this Court granting a preliminary injunction.
>
> It's my view of Title IX at the present time, and I would have to be persuaded otherwise,

that the program requires a program-wide analysis and not a sport-specific analysis." Transcript at 19.

It is difficult for this Court to fully evaluate the decision in *Arnot* because the facts of that case are not fully explained in the court's brief ruling. It appears, however, that the central question in that case is what Title IX obligations an institution has under § 106.41 where it sponsors a specific sport for one sex, but not for the other. This particular issue is not before this Court in the case at bar.

ny, the three-part test is clearly at the heart of evaluating this factor.

For clarity, I will examine the Policy Interpretation's discussion of § 106.41(c)(1) step by step. First, the Policy Interpretation spells out three underlying factors behind § 106.41(c)(1): (a) the determination of athletic interests and abilities; (b) the selection of sports offered; and (c) the levels of competition available, including the opportunity for team competition. With respect to the first factor, the Policy Interpretation states that in determining the interests and abilities of their students, institutions should take account of several factors, including the "nationally increasing levels of women's interests and abilities" and "the expressed interests of students capable of intercollegiate competition who are members of an underrepresented sex." 44 Fed. Reg. at 71417.

Next, the Policy Interpretation's analysis touches upon the "selection of sports." It notes, for example, that "where an institution sponsors a team in a particular sport for members of one sex, it may be required either to permit the excluded sex to try out for the team or to sponsor a separate team for the previously excluded sex." 44 Fed. Reg. at 71418. The Policy Interpretation then turns to the crucial "levels of competition" subsection. The discussion begins by stating that "[i]n effectively accommodating the interests and abilities of male and female athletes, institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive teams schedules which equally reflect their abilities." *Id.* The Policy Interpretation then declares that compliance will be assessed under the three-part test. It also adds that compliance with this provision will also be measured by evaluating two additional questions:

(1) Whether the competitive schedules for men's and women's teams, on a program-wide basis, afford proportionally similar numbers of male and female

athletes equivalently advanced competitive opportunities; or

(2) Whether the institution can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.

*Id.*

Finally, the Policy Interpretation concludes its discussion of § 106.41(c)(1) by offering three "overall" tests for compliance with all of § 106.41(c), not just § 106.-41(c)(1):

(1) Whether the policies of an institution are discriminatory in language or effect; or

(2) Whether disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afforded male and female athletes exist in the institution's program as a whole; or

(3) Whether the disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity.

*Id.*[9]

The Investigator's Manual provides some additional guidance in this complicated area. In its separate section on § 106.-41(c)(1), the Manual specifies that there is a two-part analysis in determining effective accommodation of student interests and abilities. First, it states that an investigation should analyze "equal opportunities to compete." Second, the investigation should assess the "levels of competition." Manual at 21. With respect to the first part, the Manual spells out the Policy Interpretation's three-part test, which it remarks "may be considered consecutively to assess the opportunity for individuals" of each sex to compete. *Id.* Focusing on the second step, the Manual recites the two additional questions relating to competitive opportunities. It states that these questions "also must be considered to assess whether the quality of competition provid-

---

**9.** These three general questions also appear at the end of the Policy Interpretation's subsection addressing the nine factors in § 106.41(c)(2)–(10), plus recruitment and support services.

ed to male and female athletes equally reflects their abilities." *Id.* at 22.

What does all of this mean? In my opinion, the three-part test is the point of departure for evaluating compliance under § 106.41(c)(1). In addition, I believe that the two questions addressing competitive opportunities must be asked when evaluating § 106.41(c)(1). Thus, in determining compliance under § 106.41(c)(1), a court must conduct a two step analysis. First, it should apply the three-part test, and second, it should apply the two questions on competitive opportunities. A violation of § 106.41(c)(1) can occur in either one of these two steps, or in both. A court should not attempt to balance a finding of violation in one step with a finding of compliance in the other. I will now apply both steps to the facts in this case.

### 4. *Applying The Standard Under § 106.41(c)(1)*

#### a. The Three–Part Test

##### (i) *Substantial Proportionality*

Plaintiffs have demonstrated that Brown does not have a "substantially proportionate" ratio of male and female varsity athletes to their respective undergraduate enrollments. As noted *supra* Part II, in 1991–92, following the demotion of the four teams, there were 529 men (63.4%) and 305 women (36.6%) in varsity sports. During that year, there were 2917 men (51.8%) and 2716 women (48.2%) enrolled as undergraduates. Thus, Brown fails to satisfy the first question.

##### (ii) *Program Expansion*

Having failed the requirements of the first question, I must look to the "escape" routes for the university under parts two and three. With respect to the "program expansion" prong, evidence has shown that Brown does not have a *continuing* practice of program expansion for women athletes, even though it can point to impressive growth in the 1970s. At least since the late 1970s, the undergraduate enrollment at Brown has hovered at roughly 51%–52% men and 48%–49% women. During this period, however, the percentage of participants in the intercollegiate athletic program has remained fairly constant at approximately 61% men and 39% female. Precise numbers were not provided for every year. But according to a 1979 Title IX study internally prepared by Brown, in 1978–79, there were 558 men (63.9%) and 315 women (36.1%) participating on varsity teams. In addition, the only women's team added since 1977 was winter track in 1982, a sport that merely involved providing indoor space to the existing women's track team.

Brown argues that equating "expansion" with increased numerical participation is overly restrictive, and that there is considerable evidence showing growth in the women's athletic program. Among other things, they allege that since the 1970s: (1) coaching for women's teams has consistently improved; (2) more coaches have been added for women's teams; (3) "admissions practices" have helped women gain participation opportunities to a greater degree than men; and (4) the level of competition for women has increased. Defendants' Post–Hearing Memorandum at 42–43.

Even accepting all of the above statements as true, I still believe that Brown has failed to satisfy the second question in the three-part test. The Policy Interpretation directly links the "program expansion" step to the number of teams and athletes participating in intercollegiate competition, regardless of whether the quality of the program has improved. Thus, I believe, that in assessing compliance with this question, a court must address past actions and future plans to add or eliminate sports, taking into consideration the interests and abilities of the underrepresented sex. This interpretation is consistent with the Investigator's Manual (at 24–25).

##### (iii) *Interests and Abilities*

Brown has failed questions one and two under the three-part test. I now move on to the last question. With all due respect to defendants' position, I find that in denying full *varsity* status to the women's volleyball and gymnastics teams, Brown has not accommodated the interests and abilities of women athletes under the existing athletic program. Keeping the two teams

at an "intercollegiate club" level is not sufficient to satisfy the third question of the three-part test. If Brown could establish that despite the statistical disparity between the number of men and women participating on varsity teams, there are no other women who want to compete at this level, the university might have a strong defense. Brown might have demonstrated, for example, that it attempted to create new varsity teams, but that there was no interest or ability to play these sports. Or, it might have shown that women have not asked Brown to establish any new varsity teams.

But that is not the case here. Brown is cutting off varsity opportunities where there is great interest and talent, *and* where Brown still has an imbalance between men and women varsity athletes in relation to their undergraduate enrollments. Both the women's gymnastics and volleyball teams have competed as varsity intercollegiate teams since 1974. More importantly, testimony at the hearing showed that these two teams were viable varsity squads when they were demoted in May 1991. The women's gymnastics team, for example, won the Ivy League championship in 1990. That same year, Eileen Rocchio, one of the plaintiffs, was the individual "all-around" Ivy League gymnastics champion, and was named rookie of the year in the East Coast Athletic Conference. Many of the individual plaintiffs who testified described in detail their dedication to sports and their years of training prior to matriculating at Brown.

Further, some evidence was suggested that other women's teams besides gymnastics and volleyball have been, and continue to be, qualified to compete at the varsity level. At this preliminary stage, I am not in a position to rule definitively on the varsity capabilities of other teams. Nor do I believe that Brown's violation of the three-part test requires it to simply create new women's varsity teams at the request of any students. Rather, Brown may con-

sider the expressed interests of the students, whether there are sufficient numbers of athletes to form a team, and whether there is a reasonable expectation of intercollegiate competition for that team. At the same time, however, as long as men continue to constitute a disproportionate piece of the varsity pie, Brown bears the burden of proof with respect to the second and third components of the three-part test. *See Favia,* slip op. at 15. In my opinion, plaintiffs have shown a sufficient likelihood of success with respect to all three questions.

My finding here rests, in part, upon the premise that intercollegiate club status is not equivalent to varsity status. To be sure, the Policy Interpretation indicates that club teams may be considered intercollegiate teams "where they regularly participate in varsity competition." 44 Fed.Reg. at 71413 n. 1. But there is evidence that the gymnastics and volleyball teams are struggling not only to remain active in varsity-level competition at Brown, but also to survive as a team at all. While the two women's teams have raised enough money to engage in intercollegiate competition in the 1991–92 and 1992–93 seasons, the total amount was much less than the modest sums they received as varsity teams.[10] As things now stand, it is unlikely that the gymnastics team will have enough money to employ a head coach after Jacqueline Court's contract with Brown expires in June 1993.

John Parry, Brown's Athletic Director from 1979 to 1990, testified that these two teams have perhaps two years of continued life from the date they lost varsity status. Without admissions preferences, a recruiting budget and varsity status, he believes new team members will not likely have the talent or ability to compete at the level of the former recruited varsity players. Thus, according to Parry, the teams will eventually lose their ability to compete and will cease to exist. Some tangible impacts

---

**10.** Volleyball operated on $41,500 in university funds and $2789 in gift funds in 1990–91. In 1991–92, volleyball subsisted on approximately $21,000. In 1990–91, gymnastics had approxi-

mately $14,000, plus its head coach's salary of $10,500. In 1992–93, gymnastics operated on roughly $6600, plus the coach's salary.

can already be seen. For example, there are substantially more "walk-ons"—or non-recruited players—on the gymnastics team following the graduation of seniors in Spring 1992. In volleyball, Dorothy Hert, the women's head coach, testified that no freshman joined the team for the past 1992 season to replace graduating seniors; the team is currently down to 11 members and next fall the team will have only five returning varsity members. On the scheduling front, the volleyball team also suffered some adverse consequences in 1991–92 and 1992–93. When an announcement was made that the four sports would no longer receive university funding, Northeastern University and Army called Brown to inform them that they no longer wanted to include the school on their schedule. Plaintiffs' Exhibit 17.

Current Brown athletic officials have acknowledged that intercollegiate club status is a clear step down for these teams. Robert Clausen, an Associate Athletic Director, conceded that Brown could have kept the women's teams at the varsity level and simply taken away their funding.[11] Jeffrey Ward, another Associate Athletic Director, testified that by changing the status of the two women's squads, Brown was altering the focus of the kind of future students it expected to attract to those teams. He also stated that athletes at the varsity level are more skilled and the level of competition is generally more intense. Finally, David Roach admitted that varsity and intercollegiate club represent separate levels of athletic competition, with varsity at the top. He confirmed that varsity status involves a level of commitment by Brown to a team that the university will support the teams and ensure their continued existence.

Indeed, Mr. Roach was so concerned about these differing classifications, that he wrote a memo in December 1991 directing coaches of the four demoted teams (plus the fencing teams) to discontinue the use of the term "club varsity" to avoid leaving "high school seniors with a false impression concerning the present status or future status of these sports." Plaintiffs' Exhibit 8. The bottom line is that Brown knows full well that the two women's teams will not be able to effectively compete at an intercollegiate level without varsity status, recruitment assistance, and some type of guaranteed funding arrangement by the university.

Of course, Brown should be free to downscale its varsity program, or even abolish the program altogether. As the defendants note, the Investigator's Manual states that "Title IX does not require institutions to offer athletics programs nor, if any athletics program is offered, is there any requirement that the program be particularly good ..." Manual at 10. But if Brown insists on operating its present varsity scheme, it must increase the number of women varsity athletes or demonstrate that there are not sufficient numbers of women interested or qualified to compete at the varsity level, regardless of whether the university provides intercollegiate club, club, intramural or recreational outlets. It is only marginally significant that Brown demoted two men's varsity teams along with the women's teams. Men still occupy a greater percentage of varsity slots than women in relation to their undergraduate populations. And under the three-part test, the university has a continuing burden to justify its lack of statistical parity as long as that imbalance exists.[12]

---

**11.** This non-funded varsity status currently exists for the men's squash team.

**12.** In support of their argument that Title IX does not require strict proportionality, defendants bring to the Court's attention two Letters of Findings issued by the Office of Civil Rights (OCR) which found compliance under § 106.-41(c)(1) where proportional participation was not present at a university.

In my view, neither of these two letters provide much support for their position. The first letter was issued on July 10, 1989, to the Univer-

sity of Nebraska at Lincoln (UNL). Overall, OCR determined that UNL was *not* in compliance with § 106.41(c). However, OCR did find that the university satisfied § 106.41(c)(1) through the *application of the three-part test spelled out in the Policy Interpretation.* While OCR found that the percentage of women participating in intercollegiate athletics at UNL was not proportionate to their enrollment, it also found that: (a) there had been no decrease in the number of opportunities for women to participate in intercollegiate athletics over the pre-

### b. Competitive Opportunities: Two Additional Questions

I now turn to the two questions contained in the Policy Interpretation focusing on competitive opportunities. Little data was presented comparing the competitive schedules of the men's and women's teams. It appears that, historically, women's teams were limited in the number and geographical scope, as well as in the competitive level, of intercollegiate contests in relation to men's teams. In recent years, however, many of these inequalities have dissipated. For example, virtually all varsity teams compete at the NCAA Division I and Ivy League level. Still, Arlene Groton, an Associate Athletic Director and Professor of Physical Education at Brown, testified that while more women's teams have been able to participate in competitions outside of New England, it has not been with the same frequency or distance available to men's teams. Plaintiffs also argue that the quality of competition of the two demoted women's team is now threatened.

My tentative view is that, "program-wide," the competitive schedules at Brown provide men and women with "equivalently advanced competitive opportunities." Thus, Brown appears to satisfy the first question. Even if not completely accurate, I believe Brown has shown "a history and continuing practice of upgrading" the level of competition for women's teams under the second question. This finding does not mean that Brown's program in any way satisfies questions two and three of the three-part test, only that the competitive opportunities in that program are proportionate to the number of men and women athletes *currently* participating. Thus, despite this preliminary ruling on competitive opportunities, I find that plaintiffs have shown a likelihood of success with respect to § 106.41(c)(1) based on Brown's likely violation of the three-part test.

### 5. *Other Factors Contained In § 106.41(c) And The Policy Interpretation.*

I have just held that: (1) the failure to satisfy the requirements of § 106.41(c)(1), standing alone, is sufficient to support a Title IX violation; and (2) the plaintiffs are substantially likely to prevail on their claim under § 106.41(c)(1). Although not necessary to this opinion, I will also evaluate evidence presented relating to potential violations in the other factors listed in § 106.-41(c) and contained in the Policy Interpretation. I believe plaintiffs have presented some compelling facts on the differences in treatment between men's and women's teams. In particular, evidence indicates substantial inequalities between the sexes in the areas of funding, publicity and recruitment. I have documented the most significant evidence presented on several of these additional elements.

### a. Funding

■ Neither Title IX nor the athletic regulation require institutions to expend equal amounts of money on members of each sex. The defendants make much of this fact. However, the regulation does state that the Education Department "may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex." § 106.41(c). Further, the Policy Interpretation indicates that compliance with the regulation can hinge at least in part upon "[w]hether disparities of a substantial and unjustified nature exist in the *benefits, treatment, services,* or opportunities afforded male and female athletes ..." 44 Fed.Reg. at 71417 (emphasis added). Thus, an examination of funding is appropriate under § 106.41(c).

---

vious 8 years; (b) there were no future plans to decrease the number of opportunities for women to compete; and (c) there had been no requests by female students to create additional teams.

In the second letter, sent to the University of Arkansas on September 1, 1989, OCR also found pursuant to the three-part test, that the university complied with § 106.41(c)(1) even though the participation opportunities for male and female athletes were not substantially proportionate to their undergraduate enrollments. But in this case, OCR concluded that "the number of participation opportunities for women has increased since 1974, while the number for men has decreased." In addition, OCR found that there had been "no petitions by students to offer other sports."

Funding for athletics at Brown derives from two major sources. The first is general revenues allocated by the university to the athletic department each year. The second source is monies raised by the Brown University Sports Foundation, an entity created in 1982 to raise funds for sports at Brown. Sports Foundation dollars are distributed through the department's regular budget process, but are separately classified as "gift accounts."[13]

In 1990–91, the total operating budget for the Brown athletic department was $7,623,131. Of this total, $5,788,898 was appropriated by the university. The Sports Foundation kicked in another $1,140,860, and the remainder came from other miscellaneous sources. Overall in 1990–91, $4,740,268 was spent on varsity sports. Men's football received the single largest chunk of the varsity money—nearly $1,280,659. Men's ice hockey and men's basketball pocketed the next largest amounts with $354,725 and $335,048, respectively. No further breakdown on the exact amounts of money spent on each men's and women's varsity teams is available from the record. However, limited data can be gleaned from the 1991 Gender Equity Study prepared by Brown for the NCAA, covering the year 1990–91. According to the Study, the total operating expenses for men's sports was $726,378

(71.2%). For women's sports, this figure was $293,798 (28.8%).[14]

With respect to recruiting efforts for varsity sports, the Study indicates that $81,532 (78.2%) was spent for men's teams, while $22,737 (21.8%) was spent on women's teams.[15] Not surprisingly, men's football and ice hockey topped the list in recruitment dollars by a wide margin. Men's sports also received more money for coaches' salaries during 1990–91. The Study states that $932,227 (72.1%) was expended for head and assistant coaches for the 15 men's varsity teams during that year. On the women's side, $360,862 (27.9%) was allocated for head and assistant coaches for 14 teams.[16]

Plaintiffs claim that the amounts listed for recruiting in the Gender Equity Study do not include significant funds available to men's teams through their gift accounts. Plaintiffs also allege more generally that gift account funds disproportionately favor men's sports and exacerbate the university funding disparities between the men's and women's programs. One reason for the lopsided gift account ledgers is apparently due to the greater difficulty in raising funds for women's sports. According to an internal Brown report issued in January 1990, for example, 65% of all donations to the Sports Foundation were restricted to three men's teams: football, basketball and ice hockey. Defendants deny that the

13. Smaller amounts of money are also raised by the Athletic Department through ticket sales, concessions and other activities.

14. It appears that these figures do not represent the total operating budgets of the men's and women's programs. Rather, they are only those expenses connected with NCAA sporting contests such as lodging, meals, transportation, officials, uniforms, and equipment expenses.

The actual figures on operating expenses in the Study are $766,228 for men's teams and $333,648 for women's teams. However, the sum of $79,700 was doublecounted for track. Thus, I have divided this amount in half and adjusted the totals.

15. Again, Brown doublecounted the amount of money it spent for track. Thus, I have divided the sum of $4500 in half and adjusted the totals.

16. Brown reported $559,636 for men's head coaches and $487,074 for assistant coaches for men's teams. I subtract $5,600 for fencing and

divide the squash coach's salary of $25,000 (shared with women's squash) and the head/assistant track coaches salaries of $111,642 (shared with women's track) in half, subtract $40,562 doublecounted for both men's track and men's cross-country, and adjust the results to a total of $932,227 for men's teams (72.1%).

Brown reported $351,138 for women's head coaches and $190,170 for assistant coaches for women's teams. I omit the doublecounting of the same head coach (subtract $39,831) and the same assistant coaches (subtract $32,294) for women's field hockey and women's lacrosse and for the same head coach for women's soccer and women's softball (subtract $52,500) and divide the head/assistant track coaches salaries of $111,642 in half (shared with men's track), and adjust the results to a total of $360,862 for women's teams (27.9%), with a total of $1,293,-089 for coaching salaries.

Sports Foundation favors men's teams over women's teams.

Without turning this discussion into a financial spreadsheet analysis, I want to specifically address the issue of gift account monies from the Sports Foundation. Brown has adopted somewhat contradictory positions with respect to these funds. On the one hand, Brown argues that their hands are often tied in spending Sports Foundation monies because it "is an entirely separate corporation—Brown does not control its restricted contributions, which can only be used for the sports designated by the donor." Defendants' Post–Hearing Memorandum at 58. The apparent reasoning behind this arrangement is that many donors do not want to "subsidize" teams, but rather seek to "enhance" funding for specific teams (e.g., a special recruiting fund for the football team).

On the other hand, the Athletic Department considers both university funding and Sports Foundation dollars as part of its overall budget. According to Brown's 1992–93 Athletic Department Policy Manual, total budgets for each team are "basically the sum" of university funds and gift accounts. Plaintiffs' Exhibit 22 at 14. The Manual also states that all of these "monies belong to the University." *Id.* It is presumably from this frame of reference that Brown officials have exercised considerable discretion over how gift accounts monies are allocated despite the wishes of specific donors. For example, David Roach prohibited the parents of some volleyball team members from paying Dorothy Hert a salary of $18,000 through the Sports Foundation even though the parents agreed to contribute or raise the necessary funds.

In my view, all monies spent by Brown's Athletic Department, whether originating from university coffers or from the Sports Foundation, must be evaluated as a whole under § 106.41(c). Thus, Title IX covers all Sports Foundation funds allocated to Brown athletics. This position is consistent with the Investigator's Manual, which warns that where "booster clubs" or other fundraising organizations help only members of one sex, the university must balance out these differences. The Manual states:

> ... institutions must ensure that equivalent benefits and services are provided to members of both sexes. Therefore, where booster clubs provide benefits or services that assist only teams of one sex, the institution shall ensure that teams of the other sex receive equivalent benefits and services. If booster clubs provide benefits and services to athletes of one sex that are greater than what the institution is capable of providing to athletes of the other sex, then the institution shall take action to ensure that benefits and services are equivalent for both sexes.

Manual at 5. Although I have just held that Sports Foundation monies spent on Brown athletics are within the ambit of Title IX, I am not in a position at this juncture to determine exactly where, if at all, Brown's allocation of Sports Foundation monies has created legally significant inequities with respect to benefits and services, or where such allocations are infringing upon the equal opportunities of one sex. However, this is an issue I intend to address when this case proceeds on the merits.

### b. Equipment and Supplies

The athletic regulation specifically lists "equipment and supplies" as a factor to consider in determining compliance with Title IX. § 106.41(c)(2). Plaintiffs presented only scattered evidence on this criteria. For example, Arlene Groton testified that in the past the field hockey team did not have enough uniforms to outfit substitutes and that team members had to undress on the field. She also testified that it was her impression that members of the men's ice hockey team are provided new uniforms every one or two years, while the women's ice hockey team gets uniforms every four or five years. There was also testimony that since the gymnastics team lost varsity status, it has not had enough money to provide leotards for each competitor.

### c. Coaching

The issue of coaching is listed in § 106.-41(c)(5). Most of the evidence offered by plaintiffs on this factor related to historical inequalities. At the present time, plaintiffs claim that most of the remaining problems are concentrated at the assistant coach level. For example, the men's basketball team has two full-time assistants, while the women's team has only one full-time assistant and one part-time assistant. Similar assistant coaching disparities apparently exist between the men's and women's lacrosse, ice hockey and crew teams. In addition, as noted above, there is a wide gap in the levels of compensation paid to coaches of women's teams in relation to men's teams.

### d. Facilities

Section 106.41(c)(7) focuses on "locker rooms, practice and competitive facilities." Again, most of the evidence presented on this factor was historical. Perhaps the most glaring problem that still exists is the ice hockey locker room facilities at Meehan Auditorium. One women's varsity ice hockey player explained at the hearing that the women's ice hockey locker room is significantly smaller than and inferior to the men's locker room.

### e. Publicity

Publicity is listed as a factor in § 106.-41(c)(10). There is strong evidence of inequalities in this area. The chief reason is that Brown's Sports Information Office, which provides media and publicity support for teams, devotes the bulk of its attention on men's football, basketball and ice hockey. Joan Taylor testified, for example, that she believed the Sports Information Office routinely assigns representatives to cover both home and away games of men's football, basketball and ice hockey. On the women's side, Ms. Taylor could only think of women's basketball as receiving comparable coverage. Intercollegiate clubs do not receive any such Sports Information support.

### f. Recruitment

Recruitment is not listed under § 106.-41(c), but is considered a target area in the Policy Interpretation. As noted above, data show that in 1990–91 men's teams received more than three times the amount of recruiting dollars than women's teams. In total, Brown spent $81,532 on men's teams and $22,737 on women's teams.[17] The two biggest beneficiaries were men's football and ice hockey.

Robert Clausen also testified that men's teams have more cars available to their coaches than women's teams for recruiting. As of the summer of 1990, no women's team had a car available. In contrast, football had six cars, men's basketball had three cars, and men's ice hockey and lacrosse each had one car. Since that time, women's basketball has been provided a car.

While inconclusive at this stage of the proceeding, plaintiffs have presented evidence showing possible violations of other elements of Title IX. After further discovery, plaintiffs may be able to prove such infractions. For the moment, however, I decline to rule on these issues. Having determined that plaintiffs are likely to succeed on the merits, I now turn to the remaining components for determining whether to grant injunctive relief.

### B. Irreparable Harm

I see no need to belabor the issue of irreparable harm. Plaintiffs have demonstrated a strong likelihood of irreparable harm in three major areas. The first is recruitment. In the absence of injunctive relief, women's gymnastics and volleyball will be unable to attract varsity-caliber athletes to Brown. Both Jacqueline Court and Dorothy Hert testified that they have had a difficult time recruiting qualified students to Brown since the change in status. Both coaches also remarked that even a temporary order by this Court restoring their varsity status would help their efforts to attract freshman recruits. They also testified that over 50 high school seniors have

---

17. Again, plaintiffs claim that these figures do not include substantial amounts of recruiting

monies available to men's teams from gift accounts.

expressed interest to each of them in attending Brown and participating at the varsity level. With restored varsity status, Hert explained, the volleyball team would have the necessary admissions preferences to allow her targeted recruits to be admitted to Brown, even if they had lesser academic credentials than the average incoming freshman. Hert also testified that the Admissions Office did not admit any of the volleyball candidates she submitted to them last year. While the formal application deadline for next year is January 1, 1993, a document written by the Admissions Office entitled, "Coach's Handbook, Admission Procedures, Class of 1997," and dated August 15, 1992, states that applications for varsity athletic recruits will be accepted as late as March 5, 1993. Plaintiffs Exhibit 27 at 5, 10. Thus, immediate injunctive relief would allow these teams to recruit effectively for the 1993-94 seasons.

The second area of irreparable harm is the "competitive" posture of the two women's teams. As discussed in length above, there is little question that the women's teams will be unable to maintain the same level of intercollegiate competition in their demoted capacity as they did when they were varsity sports. Again, part of the problem stems from the inability to recruit new team members that will have the talent or ability to compete at the level of the former recruited varsity players. Already there are substantially more "walk-ons" on both teams. In addition, both teams have seen cut-backs in their competitive opportunities. As noted, Northeastern University and Army informed Brown shortly after the change in status that they no longer wanted to compete against the volleyball team. Plaintiff Eileen Rocchio was unable to compete in the NCAA regionals due to budgetary constraints. And David Roach, perhaps signifying the Athletic Department's lowered expectations for intercollegiate club sports, refused to allow the volleyball team to host the fall 1992 Ivy League championship.

The third area of harm relates to coaching staff. In the absence of preliminary relief, gymnastics probably will not have enough money to employ a new head coach after Ms. Court's contract expires in June 1993. Based on past fundraising efforts, it appears unlikely that the team will be able to raise at least $10,000 more than it has in the past in order to pay a head coach's salary. Without a coach, there is little chance the gymnastics team will be a viable intercollegiate competitor.[18]

Defendants advance several arguments why plaintiffs have not demonstrated irreparable harm. All are without merit. They first argue that plaintiffs cannot demonstrate irreparable harm because there is no legally significant difference between intercollegiate club teams and varsity teams. I have already explained in detail why I believe intercollegiate club status is not equivalent to varsity status under the existing Brown program. Thus, I reject this argument outright.

Another argument put forward by defendants is that the two women's teams can still actively recruit new members. They note, for example, that at least two of the plaintiffs decided to attend Brown *after* they learned that gymnastics and volleyball were "unfunded." Further, defendants argue that many students will come to Brown whether they are recruited or not because of its reputation for academic excellence. The problem with defendants' argument is that it rests upon the assumption that any team, whether it compete at a superior level or a low level, satisfies the requirements of Title IX. As stated repeatedly throughout this opinion, however, § 106.-41(c)(1) requires institutions to "effectively accommodate the interests and abilities" of its students. In addition, § 106.41(c)(1) specifically addresses the issue of "levels of competition." In short, not all intercollegiate teams are the same.

Defendants also refute plaintiffs' claim that there are admission preferences available to varsity teams. David Roach testi-

---

**18.** I should note that neither of the two demoted men's teams—water polo and golf—are currently in danger of losing their head coaches. At the hearing, testimony revealed that both coaches have paid positions in other areas of the Brown Athletic Department.

fied that Brown does not guarantee admission of a particular number of people for any varsity sport. Rather, in his words, "[t]here's a range or a pattern or a number but it is only relative to the academic credentials of the people who apply." He added that the "admissions process" between the athletic department and the Admissions Office "allows the coach to have a better understanding of what the ... chances are of someone being accepted and to not waste their time recruiting someone who's not going to be accepted." Transcript, November 12, 1992, at 88.

Despite these disavowals, there was ample evidence presented that recruitment or admissions preferences exist at Brown, even if the exact number of slots for each team are not carved in stone. For example, in a memo dated December 11, 1990 to Ed Reed, the men's swimming and water polo coach, David Roach wrote regarding the "Number of Acceptances from Admissions":

> Ed, to further clarify your number of acceptances for this year. Your minimum numbers are 20 for swimming and 4 for water polo. These numbers are the least that you would receive.
>
> I hope this better defines the numbers for you.

Plaintiffs' Exhibit 25. In addition, as indicated above, Brown publishes a "Coach's Handbook" on "admission procedures." Among other things, the Handbook for the Class of 1997 lists the Admission's Office "liaison" for each varsity team. Women's volleyball and gymnastics are not included on the current list, although these teams were assigned liaisons in the Class of 1994 Handbook. The 1997 Handbook also lays out key dates for presenting names of potential recruits and provides forms for ranking top choices that must be submitted to the Admissions Office.[19]

Lastly, defendants assert that Title IX does not recognize individual harm. They quote from the Policy Interpretation, which states: "If women athletes, as a class, are receiving opportunities and benefits equal to those of male athletes, individuals within the class should be protected thereby." 44 Fed.Reg. 71421. But women athletes are *not* receiving opportunities and benefits equal to their male counterparts. I have held that Brown is not effectively accommodating the interests and abilities of the two women's teams under § 106.41(c)(1). Thus, in my view, there is class-wide injury to women athletes at Brown under this provision.

This brings me to an important point about the nature of the relief I am granting. I am sensitive to defendants' concerns about requiring specific teams to be funded as varsity. And I have no desire to micromanage Brown's athletic program. Under § 106.41(c)(1), Brown has wide latitude in structuring its intercollegiate athletic program. Brown may choose, for example, to drastically reduce the number of intercollegiate teams it sponsors. Or it may decide to eliminate the varsity program altogether. Brown may not, however, operate an intercollegiate program that disproportionately provides greater participation opportunities to one sex in relation to undergraduate enrollments, where there is no evidence of continuing program expansion or effective accommodation of the interests and abilities of its students. And that is exactly what plaintiffs have shown a likelihood of success of proving in this case.

Defendants argue that the purpose of a preliminary injunction is to preserve the status quo until a trial on merits can be held. The First Circuit has defined the status quo as the " 'last uncontested status which preceded the pending controversy.' " *Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, and Packers,* 679 F.2d 978, 995 (1st Cir.1982), *rev'd on other grounds,* 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984) (quoting *Westinghouse Electric Corp. v. Free Sewing Machine Co.,* 256 F.2d 806, 808 (7th Cir. 1958)). In the case at hand, the status quo

---

**19.** John Parry testified that when he was Brown's Athletic Director in 1983, he was told by the Director of Admissions that 90% of the athletes who were accepted by Brown would not have been admitted if they weren't on a coach's admissions preference list.

existed in May 1991, immediately before the change in status of the four teams. Many of the named plaintiffs protested the change in status from the moment David Roach made the announcement, and continued to resist the demotion until this lawsuit was filed. Moreover, even if the current configuration of teams were considered the status quo, restoring women's gymnastics and volleyball to full varsity status through a preliminary injunction is the only effective tool available to this Court to prevent irreparable harm. *Crowley*, 679 F.2d at 995–996; *see also Ferry–Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir.1984) ("... where the status quo is a condition not of rest, but of action, and the condition of rest ... will cause irreparable harm, a mandatory preliminary injunction is proper").[20] For the same reason, I must also preliminarily enjoin Brown from reducing the status or funding of any other women's varsity team until this case is resolved on the merits. If I should rule in plaintiffs' favor on the merits, I would *then* allow Brown the opportunity to present its own plan to the Court on how it intends to comply with the requirements of § 106.-41(c)(1).[21]

### C. Balancing of Relevant Equities

Brown argues that the granting of a preliminary injunction would be a significant hardship on the university. I disagree. Brown's primary argument is that the injunction would interfere with the university's budgeting process. Their key witness on this point was Brown's Financial Vice–President, Dr. Donald Reaves. In response to a question from the Court, Dr. Reaves testified that complying with a court order to fund the gymnastics and volleyball teams would, in his view, result "in the loss of control over decisions that need to be made at the university." Transcript of November 12, 1992, at 17.

I fully appreciate Brown's position and understand that it faces painful budgetary decisions. However, the amount of money required to restore these two teams is minuscule in relation to Brown's overall budget. Cutting these two teams saved the university roughly $62,000 per year. Dr. Reaves testified that Brown annually sets aside 1% of its operating budget for unanticipated expenses in the President's "contingency fund." At the present time, this fund has approximately $1.5 million in uncommitted monies. Robert Clausen also indicated that the Athletic Department has other sources of unrestricted and unbudgeted revenues. For example, the department receives unrestricted gift monies from the Sports Foundation each year. In 1990–91, the Department spent roughly $50,000 out of that account, with an additional $37,000 left over. In 1991–92, $77,-500 was taken out of that account and a total of $139,000 was available that year.

---

**20.** Defendants also assert that a "mandatory" preliminary injunction should only be granted in exceptional circumstances. Chief Judge Breyer addressed this argument in *United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir.1987), stating that "the relevant First Circuit authority does no more than suggest that courts disfavor injunctions that disturb, rather than preserve, the status quo. And this fact, in turn suggests that we should view [such an injunction] not as mandatory, but as prohibitory" (citations omitted).

I also note that the First Circuit has recognized that " '[d]istrict courts have broad discretion to evaluate the irreparability of the alleged harm and to make determinations regarding the propriety of injunctive relief.' " *K–Mart Corp. v. Oriental Plaza*, 875 F.2d 907, 915 (1st Cir.1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C.Cir.1987)).

**21.** On a general note, I would like to add that I was rather surprised at Brown's apparent indifference towards Title IX. Both David Roach and Robert Clausen, top decisionmakers in the Athletic Department, testified that while they were cognizant of Title IX, they did not review the statute or the athletic regulation in reaching their decision to reduce the status of the four teams. Mr. Roach and Mr. Clausen also stated that they had not heard of the Official Policy Interpretation, nor did they conduct any studies to assess Brown's compliance with Title IX. In making the cuts, Mr. Clausen also testified that the Department had no intent to structure the number of varsity opportunities to reflect the percentage of men and women undergraduates, but rather only to downsize the program in proportion to the existing varsity athletes. From the evidence presented, it also appears that Brown has not conducted any Title IX studies since 1979.

In sum, I do not believe the temporary funding of these two women's teams would be an undue burden on Brown University.

### D. Public Interest

Brown has likely violated Title IX by not providing women with equal opportunities in the operation of its intercollegiate program. In my view, the public interest will be served by vindicating a legal interest that Congress has determined to be an important one. Moreover, I do not believe the requested injunctive relief would have a detrimental effect on the public interest.

### V. *Conclusion*

For all the reasons stated above, Brown University is ordered to take the following actions immediately:

1. Restore women's gymnastics and women's volleyball to their former status as fully funded intercollegiate varsity teams in Brown's intercollegiate athletic program;

2. Provide coaching staff, uniforms, equipment, facilities, publicity, travel opportunities and all other incidentals of an intercollegiate varsity team at Brown to women's gymnastics and women's volleyball on a basis equal to that provided to these teams during the 1990–91 school year;

3. Provide university funding to the two women's teams in an amount equal to that provided to the teams during the 1990–91 school year;

4. Provide an on-campus office, long-distance telephone and clerical support for the head coaches of the two teams, assign admissions liaisons, restore special admissions consideration to athletic recruits identified by the head coaches, and extend the deadline for filing applications to Brown for such recruits to the same date as the latest accorded to any recruits identified by other intercollegiate varsity teams for 1992–93, or by March 5, 1993, whichever is later; and

5. Prohibit the elimination or reduction in status, or the reduction in the current level of university funding, of any existing women's intercollegiate varsity team until this case is resolved on the merits.

Let me reiterate that I view the restoration of the two women's teams to full varsity status as a temporary solution. If I find at a trial on the merits that Brown has violated Title IX with respect to § 106.-41(c)(1), I will leave it to Brown to draw up its own plan for complying with this provision. In short, Brown has the ultimate discretion in how it chooses to structure its intercollegiate athletic program, if it decides to operate one at all, so long as it satisfies the dictates of Title IX.

SO ORDERED.