Jennifer ROBERTS, Julie Osborne, Janet Brumbelow, Laura Bielak, Sara Stout, Amy Recouper, Jennifer Jacobs, Malia Kuenzli, Stacie Stafford, Heather Nakasone, Kim Johnson, Aimee Rice, and Lisa Mize, Plaintiffs,

v.

COLORADO STATE UNIVERSITY, Colorado State Board of Agriculture, in its capacity as the entity charged with the general control and supervision of Colorado State University, Defendants.

Civ. A. No. 92–Z–1310.

United States District Court, D. Colorado.

Feb. 18, 1993.

John M. Kobayashi, Pamela A. Gagel, Karen E. Robertson, Kobayashi & Associates, P.C., Denver, CO, Ellen J. Vargyas, National Women's Law Center, Washington, DC, for plaintiffs.

William E. Thro, Michael Stuart Williams, Michael S. Schreiner, Lee R. Combs, Office of the Atty. Gen., Denver, CO, Lee R. Combs, Associate Gen. Counsel, Denver, CO, for defendants.

## OPINION AND ORDER

WEINSHIENK, District Judge.

### Procedural and Factual Background

Plaintiffs are former members of the Colorado State University (CSU) women's varsity softball team which was terminated on June 1, 1992. Plaintiffs seek reinstatement of the softball team and damages. A hearing on plaintiffs' Complaint For Injunctive Relief was held on July 17, 1992. At that time, the Court denied plaintiffs' Motion For Injunctive Relief due to plaintiffs' inability to demonstrate a substantial likelihood of success on the merits. *Lundgrin v. Claytor,* 619 F.2d 61 (10th Cir.1980). At the conclusion of this hearing, the parties stipulated to a stay of the sale of the softball team's equipment,

plaintiffs' continued receipt of their softball scholarships without work requirements for the 1992–1993 school year, and expedited discovery. A status conference was held on October 26, 1992, at which the parties agreed to bifurcate the violation and damages phases of the trial. The case is set for a two day trial to Court on the issue of damages on Thursday, March 25, 1993.

A trial to court concerning plaintiffs' request for a permanent injunction reinstating the women's intercollegiate softball program at CSU was held on November 19, 1992, continuing on November 20, 23, and 24, 1992. After careful consideration, the Court has made findings of fact and conclusions of law based upon the evidence presented during the trial and the pre-trial briefs submitted by the parties.

Regulatory Framework of Title IX

The central question in this case is whether defendants' termination of the women's softball team either caused a violation of Title IX or was the perpetuation of an already existing violation by defendants. This and other issues presented in the instant case necessitate a brief analysis of the regulatory framework of Title IX. Title IX, which is codified at 20 U.S.C. § 1681, became effective on July 1, 1972, and provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Defendants concede that Colorado State University is an educational institution receiving federal financial assistance, and the Court determines that CSU's athletic department is subject to the provisions of Title IX.

The regulations interpreting the application of Title IX to athletic programs became effective on July 21, 1975. These regulations require that "a recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). In determining whether equal opportunities¹ are available, the Director of the Office of Civil Rights of the Department of Education (OCR) must consider, among other factors, "whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1).

A Policy Interpretation further developing the meaning of "equal opportunity" in intercollegiate athletics was issued in 1979. See Policy Interpretation, 44 Fed.Reg. 71413 (Dec. 11, 1979). The express purpose of the Title IX Policy Interpretation is to explain the factors and standards which the Department of Education will consider in determining whether an institution's intercollegiate athletics program complies with the law and governing regulations. 44 Fed.Reg. 71413. The policy interpretation is divided into three areas of inquiry: Athletic Financial Assistance (Scholarships), 34 C.F.R. § 106.37(c); Equivalence in Other Athletic Benefits and Opportunities, 34 C.F.R. § 106.41(c)(2)–(10); and Effective Accommodation of Student Interests And Abilities, 34 C.F.R. § 106.41(c)(1). 44 Fed.Reg. at 71414.

In April of 1990, the OCR of the Department of Education issued the *Title IX Athletics Investigator's Manual* to assist OCR personnel in conducting athletic investigations. Defendants' Exhibit A. According to the Investigator's Manual, "the intercollegiate athletics Policy Interpretation requires that OCR use an overall approach and review the total athletics program for intercollegiate athletics investigations." *Id.* at 7. However, the Investigator's Manual also reiterates the three major areas of investigation established in the Policy Interpretation and states that "an investigation may be limited to less than all three of these major areas where unique circumstances justify limiting a particular investigation to one or two of these major areas." *Id.*

■ Plaintiffs' allegations of discrimination under Title IX are narrowly stated under the third prong of the Policy Interpretation: Effective Accommodation of Student Interests And Abilities, 34 C.F.R. § 106.41(c)(1). Although defendants argue that the language in the Investigator's Manual requires that plaintiffs demonstrate an overall violation of either 34 C.F.R. § 106.37(c) or 34

C.F.R. § 106.41(c)(1)–(10) in order to sustain a claim of discrimination under Title IX, the Court is satisfied that the regulations and Policy Interpretation allow for a showing of violation under 34 C.F.R. § 106.41(c)(1) only. The decisions in *Favia v. Indiana University Of Pennsylvania,* 812 F.Supp. 578 (W.D.Pa. 1993), and *Cohen v. Brown University,* 809 F.Supp. 978 (D.R.I.1992), support this view. In *Favia,* female students sought reinstatement of two women's teams eliminated by the defendant university's budget reduction efforts. Although the *Favia* Court mentioned disparities in athletic scholarships in the opinion, the Court's ruling in favor of plaintiffs was based largely upon an analysis made under 34 C.F.R. § 106.41(c)(1). *Favia,* 812 F.Supp. at 584. Plaintiffs in the *Cohen* case challenged Brown University's demotion of two women's teams from varsity to club status. In granting plaintiffs' motion for a preliminary injunction, the *Cohen* Court specifically held that a finding of a Title IX violation may be limited solely to 34 C.F.R. § 106.41(c)(1). *Cohen,* 809 F.Supp. at 989.

Although minor inconsistencies do exist between the Policy Interpretation and the Investigator's Manual, an evaluation of CSU's entire athletic program is neither required nor necessary to the resolution of the issues presented in this case. After examining both the regulatory framework of Title IX and the language in the *Favia* and *Cohen* cases, the Court is convinced that a violation of Title IX may be shown by proof of a substantial violation in any one of the three major areas of investigation set out in the Policy Interpretation. Thus, the Court's findings of fact and conclusions of law will be limited to 34 C.F.R. § 106.41(c)(1), the prong regarding the effective accommodation of student interests and abilities.

■ The Policy Interpretation delineates three areas of inquiry which should be considered in assessing compliance with 34 C.F.R. § 106.41(c)(1):

1. Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

2. Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the members of that sex; or

3. Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of that sex have been fully and effectively accommodated by the present program.

44 Fed.Reg. at 71418. The Court will hereafter refer to these three prongs as the "Effective Accommodation" test. Plaintiffs have the burden of proving that intercollegiate level participation opportunities for male and female students are not provided in numbers substantially proportionate to their respective enrollments. *Favia,* 812 F.Supp. at 584. Defendants have the burden of proof as to the second and third prongs of the Effective Accommodation test. *Id.; See also, Cohen,* 809 F.Supp. at 992.

Findings of Fact and Conclusions of Law

1. Substantial Proportionality

■ At trial, defendants argued that the Court should not rely on the statistics submitted by plaintiffs for the 1980–81 and 1981–82 school years in determining whether CSU is in compliance with 34 C.F.R. § 106.-41(c)(1). *See* Plaintiffs' Exhibit 64. All of the figures contained in Exhibit 64 were obtained from Ms. Roselyn Cutler, CSU's Title IX Coordinator, either during or after her deposition. Ms. Cutler testified at trial that the figures for the 1980–81 and 1981–82 school years were taken from the squad lists for that year. Although defendants stressed Ms. Cutler's testimony on redirect that she was unable to confirm the validity of the figures for the years in question, they failed to explain why the same allegedly unreliable figures were provided to the OCR in 1983 during the OCR's Title IX compliance review of CSU. Defendants also have failed to offer

any figures which they believe to be more accurate than those before the Court. Finally, defendants did not articulate any cognizable difference between the manner in which the figures for the two years in question were compiled and that in which the figures for the other years were gathered. For these reasons, the Court rejects defendants' argument and will therefore consider as accurate the figures for the 1980–81 and 1981–82 school years indicated in Exhibit 64.

Beginning with the 1980–81 academic school year and ending with the current school year, the gaps between women's athletic participation rates and their undergraduate enrollment at CSU have been, respectively, 7.5%, 12.6%, 15.6%, 15%, 18.6%, 12.3%, 16.5%, 14.8%, 15.6%, 16.7%, 14.9%, 12.7%, and 10.6%. *See* Exhibit 64. During this twelve year period, the average disparity between enrollment and athletic participation rates for women was 14.1%.

During the 1991–92 academic school year CSU funded a total of 17 varsity teams for male and female students. Defendants' Exhibit R. In 1991–92, women comprised 35.2% of the total athletes at CSU. At the same time, the enrollment of women at CSU was 47.9% of the total student population. Exhibit 64. Thus, the disparity between the percentage of women enrolled at CSU and the percentage of women participating in athletics at CSU prior to the June 1, 1992, termination of the women's softball team was 12.7%. In the current 1992–93 school year, women athletes now make up approximately 37.7% of total athletes participating in CSU's intercollegiate programs. The enrollment of women at CSU is currently 48.2% of the undergraduate student population. Therefore, the enrollment versus participation disparity rate for females at CSU after the termination of the women's softball team is 10.5%. *Id.*

CSU argues that its current female participation rate is substantially proportionate to the current female enrollment rate. Defendants' Pre–Trial Brief, p. 11. According to defendants, the regulatory framework of Title IX provides no guidance in determining substantial proportionality. In addition, defendants argue that the OCR has specifically

rejected the setting of a particular figure against which compliance with 34 C.F.R. § 106.41(c)(1) can be judged. *Id.* at 12. The language contained in the Investigator's Manual to which defendants are apparently referring reads that "there is no set ratio that constitutes 'substantially proportionate' or that, when not met, results in a disparity or a violation. All factors for this program component, and any justifications for differences offered by the institution, must be considered before a finding is made." Defendants' Exhibit A at 24. However, this section of the Investigator's Manual must be read in conjunction with other relevant language contained in the manual, with the October 14, 1983, Statement of Findings issued by the OCR after it completed a Title IX compliance review of CSU's athletic department, and with the *Cohen* case.

In the paragraph immediately preceding the language upon which defendants' apparently rely, the Investigator's Manual directs OCR personnel investigating the substantial proportionality prong under 34 C.F.R. § 106.41(c)(1) to first compare the number of male and female participants with the number of full-time undergraduate students. Exhibit A at 24. The manual then advises OCR investigators that "if the results are substantially proportionate (for example, if the enrollment is 52% male and 48% female, then, ideally, about 52% of the participants in the athletics program should be male and 48% female), the recipient is effectively accommodating the interests and abilities of both sexes." *Id.* The Court finds this language to be useful in determining the intended meaning of the term "substantially proportionate". The following language contained in the Investigator's Manual also is considered by the Court:

> OCR investigative experience indicates that where budget restrictions have led a recipient to eliminate sports previously offered, there is frequently a compliance problem with this program component. The tendency is for institutions to eliminate a sport previously offered to women who are already underrepresented in the institution's athletics programs. The result has been that women are now more

disadvantaged by the elimination of a women's team despite sufficient interest and ability to sustain a viable team. In this situation, the institution may well be in violation of this program component.

*Id.* at 27.

The Statement of Findings issued by the OCR after completing a Title IX compliance review at CSU in 1983 provides the Court with further guidance as to what numerical disparity between female participation rates and enrollment should be considered to be "substantial." In its Statement of Findings, the OCR refers to a table listing sports and the number of participants for three academic years, 1980–81 through 1982–83. Plaintiffs' Exhibit 2 at 77. Noting a difference between the percent of women enrolled and women's athletic participation of 7.5%, 12.5%, and 12.7%, respectively, for the three academic years being reviewed, the OCR concluded that "the intercollegiate level participation opportunities for male and female students are not substantially proportionate to their respective enrollments." *Id.* The OCR also noted that women's field hockey was to be dropped following the 1983–84 academic year, stating that "as a consequence of this action, the disparity between women's participation opportunities not being substantially proportionate to their enrollment will be exacerbated." *Id.*

Finally, the recent decision in the *Cohen* case offers the Court additional guidance on the meaning of the term substantially proportionate. In *Cohen,* the disparity between the defendant university's female athletes and their respective enrollments after the demotion of four varsity teams was found to be 11.6%. *Cohen* at 991. Based on this disparity, the *Cohen* Court held that plaintiffs had successfully demonstrated that the ratio of female varsity athletes to their respective enrollments was not 'substantially proportionate." *Id.*

■ After reviewing the statistical evidence submitted at trial and the sources of guidance cited in the preceding paragraphs, the Court determines that the current rate of female participation in athletics at CSU is not substantially proportionate to female undergraduate enrollment. More specifically, the Court finds that a disparity between female athletic participation and female undergraduate enrollment of 10.6% is not acceptable under Title IX absent a showing by defendants under the second or third prong of the Effective Accommodation test.

In addition, the Court finds that for at least the last decade, female participation rates at CSU have not been substantially proportionate to CSU's female undergraduate enrollment. The affidavit of Dr. Mary Gray, a professor of mathematics and statistics at American University, was introduced at trial. Plaintiffs' Exhibit 54. In this affidavit, Dr. Gray testified credibly and persuasively that the difference between the proportion of women as undergraduates and their participation rate in athletics at CSU is highly statistically significant, and represents a persistent pattern over the last ten years. The Court agrees with Dr. Gray's conclusion that the disparities between women's enrollment and athletic participation rates at CSU over the last decade could not have occurred merely by chance.

■ On a final note, defendants argued strenuously in their brief and at trial that a finding by this Court that CSU's female enrollment versus participation statistics are not substantially proportionate will necessarily implicate the athletic departments of virtually every institution of higher education in this country. Plaintiffs, however, have alleged a violation of Title IX solely against CSU. In addition, if defendants are found by this Court to be in violation of Title IX, the fact that CSU's participation statistics are better than those of other schools is of no legal consequence. Accordingly, this Court has not considered how CSU's participation rates compare with those of other undergraduate institutions. The issue of whether other universities are complying with Title IX is for other courts to decide based upon individualized allegations and independent findings of fact.

2. History of Program Expansion

It has been demonstrated that female enrollment is not substantially proportionate to female athletic participation at CSU. There-

fore, the Court must now consider the second prong of the Effective Accommodation test. This prong is particularly difficult to determine given the fact that the absolute number of opportunities to compete in intercollegiate athletics at CSU has decreased for both women and men in the last decade. Unfortunately, CSU has been no exception to the economic reality of more restrictive budgets which most of our nation's educational institutions are facing. However, because women were in the past and continue to be underrepresented in CSU athletics, CSU must demonstrate to the Court's satisfaction a history and continuing practice of program expansion for women.

■ While admitting that prior to 1970, CSU did not offer a single sport for women, defendants point to the addition of eleven sports for women during the 1970's as evidence of athletic program expansion for women at CSU. Defendants' Pre–Trial Brief at 14. Although the Court agrees that the eight women's teams currently offered by CSU are an improvement over the non-existent state of women's teams prior to 1970, the Court cannot accept defendants' conclusion that the mere fact that CSU now offers women's teams is evidence of program expansion for women. This Court's acceptance of such an argument would render meaningless Title IX's regulations and its Policy Interpretation. Acceptance of this argument also would implicitly condone the attitude that female athletes at CSU should be satisfied with their current opportunities given the pre–1970 lack of participation opportunities for women in intercollegiate athletics. The regulations which implemented Title IX were promulgated for the very purpose of rectifying historical inequities between men's and women's intercollegiate athletic programs. Indeed, the program expansion prong of the Effective Accommodation test was not intended to stop the compliance inquiry as to any institution that can demonstrate that it has added a women's sports team sometime in the last three decades. In this regard, the Court rejects as insufficient defendants' assertion that they have demonstrated program expansion because women's teams were added at CSU during the 1970's.

■ CSU further contends that its decision to cut baseball and softball must be regarded as a positive proportional development for women under Title IX because the termination of women's softball, with its 18 participants, and men's baseball, with its 55 participants, actually caused the women's participation rate at CSU to rise. Defendants' Pre–Trial Brief at 6. While it is true that the disparity between women's enrollment and athletic participation is less now than it was prior to the termination of softball, defendants' assertion fails to take into consideration the facts that the actual number of athletic participation opportunities for women at CSU have steadily declined over the past twelve years and that no new varsity teams for women have been added during that time. The Court determines that CSU cannot show program expansion for women solely by pointing to increases in the percentage of women athletes caused by reducing the number of men athletes. CSU must either demonstrate actual expansion in women's athletic programming or establish that it has considered and improved upon the underrepresented status of women athletes when reductions in athletic programs became necessary in the past.

■ After considering the dynamics of program contraction at CSU over the last twelve years, the Court is convinced that CSU did not seriously consider nor improve the representation of female athletes when budget cuts became necessary. For example, four women's varsity teams have been dropped since the 1980–81 school year; gymnastics in 1980, field hockey in 1984, junior varsity volleyball in 1987, and softball in 1992. During the same time period, and despite the underrepresentation of women athletes, the men lost only three varsity teams; gymnastics in 1980, wrestling in 1986, and baseball in 1992.

Since 1980–81, the total number of participation opportunities for women athletes have decreased from 183 opportunities to 120 in 1992–93. During the 1980–81 school year, male athletes at CSU maintained 246 participation opportunities. This number has decreased to 198 male participation opportunities in 1992–93. See Exhibit 64. Thus, it is

undeniable that in the last twelve years women's participation opportunities have declined by approximately 34 percent or 63 participation opportunities while men's participation opportunities have declined by approximately 20 percent or 48 participation opportunities. The Court finds that in the last twelve years, women have been disproportionately impacted by the general reduction in athletic participation opportunities at CSU. In accordance with this finding, the Court concludes that CSU has failed to demonstrate program expansion in the area of providing athletic participation opportunities for women.

■ The Court determines that the relevant period of inquiry as to CSU's other program expansion efforts is the era in which CSU was put on notice that female athletes' participation rates were not substantially proportionate to female undergraduate enrollment. In 1983, the OCR for the Department of Education conducted a Title IX Compliance review of CSU's athletic department. In the cover letter attached to the OCR's Statement of Findings, the former Regional Director of the OCR, Dr. Gilbert D. Roman, indicated that "benefits, opportunities, and treatment are not equivalent in the areas of equipment and supplies, locker rooms, coaching, recruitment, publicity, support services and the effective accommodation of student interests and abilities. OCR concluded that collectively these disparities violate Title IX." Plaintiffs' Exhibit 2 at 3–4. Dr. Roman went on to state, however, that "based upon your written assurance that the remedial actions set forth in your submitted plan are being implemented, we consider Colorado State University to be presently fulfilling its obligations under 34 C.F.R. § 106.41(c) ... continued compliance is contingent upon carrying out the provisions of the plan." *Id.*

The corrective action plan to which Dr. Roman referred in his letter was submitted to the OCR in September of 1983. *See* Plaintiffs' Exhibit 6. In this plan, CSU committed to raising the participation rate of women to 46.5% by the 1987–88 school year. CSU also agreed to develop junior varsity teams for the women's volleyball and basketball teams.

In addition, CSU pledged itself to small increases in participation on several of the women's teams. The evidence received at trial demonstrated that CSU did not meet its 1987–88 participation goal of 46.5 percent. In fact, the evidence shows that the athletic participation rate of females at CSU during the 1987–88 school year was 33.8 percent. *See* Exhibit 64. The evidence also indicates that CSU added a women's junior varsity volleyball team in 1984, but dropped the team in 1987.

In May of 1985, defendants submitted to the OCR a progress report concerning the implementation of their 1983 Title IX corrective action plan. *See* Plaintiffs' Exhibit 15. In this progress report, defendants' represented to the OCR that "the Corrective action plan states 'In 1987–88, 46.5% of the participants will be women and 53.3% will be men.' In pursuit of that goal, and precisely as planned for 1984–85, the 1984–85 participation rates were 42.9% for women and 57.1% for men." *Id.* at 3. However, Ms. Cutler testified at trial that the female participation percentage stated in the letter was incorrect. From the figures produced by Ms. Cutler at her deposition, it appears that the actual female participation rate for women during the 1984–85 school year was 30.7%. *See* Exhibit 64. In their progress report, defendants also reported to the OCR that due to the elimination of men's varsity wrestling, it was no longer necessary to add a women's junior varsity basketball team in order to achieve the participation figures outlined in the 1983 corrective action plan. Exhibit 15 at 4.

On February 10, 1989, defendants submitted another status report to the OCR regarding CSU's 1983 corrective action plan. Plaintiffs' Exhibit 14. In this status report, defendants admitted that they had not achieved the participation goal for women delineated in their 1983 corrective action plan and attempted to explain their failure. *Id.* at 6. The two reasons cited by defendants as leading them to believe that the participation goal of 46.5% for women was unattainable were that other institutions with which CSU participated regularly had lower participation rates and that statistics generated by the

Colorado Department of Education indicated that females made up only 40% of all Colorado high school athletes. *Id.* Defendants also stated that they would put forth their best efforts to maintain or diminish the ratio between CSU's female participation rate and that of Colorado's female high school athletes. Finally, defendants indicated that subsequent to the termination of men's baseball in 1989–90, they planned to modify the on campus baseball field for use as a women's softball facility. *Id.* at 4.

 In a letter dated March 8, 1989, Dr. Roman responded to defendants' February 10, 1989, progress report. Defendants' Exhibit BL. In this letter, Dr. Roman determined that CSU had provided "valid, nondiscriminatory reasons" for not meeting the participation goals articulated in defendants' 1983 corrective action plan. *Id.* at 2. Dr. Roman also indicated that the monitoring procedures of CSU's athletic department were terminated given CSU's "good faith efforts to increase athletic opportunities for female student athletes." *Id.* With all due respect to Dr. Roman's conclusions, this Court determines that the excuse offered by CSU that other institutions had worse participation rates for female athletes than did CSU is not a valid nondiscriminatory reason for maintaining female participation rates which are substantially disproportionate to female undergraduate enrollment. With regard to defendants' justification that Colorado high school female athletes participate at a rate of 40%, the Court notes that defendants have not matched this lesser and presumably attainable goal of 40% female participation since the 1980–81 school year. *See* Exhibit 14 at 6; *see also*, Exhibit 64. Moreover, the Court finds that CSU's participation figure for females at the time the OCR terminated its monitoring procedures in 1989 were actually lower than they were before the OCR's Title IX compliance review began in 1983. *See* Exhibit 64. The Court concludes that lower participation rates and decreasing participation opportunities for women are not indicators of a good faith effort on behalf of defendants to increase athletic opportunities for female student athletes at Colorado State University.

On November 20, 1991, the CSU athletic department issued a Strategic Plan for Fiscal Years 1992–93—1996–97 which identified five programs of emphasis. Plaintiffs' Exhibit 18. The five programs designated for emphasis include football, men's basketball, academic support services, athletic development, and marketing/promotion activities. *Id.* at 6. Although three of the programs to be emphasized presumably will impact female athletes, the only specific mention of future plans to benefit women athletes comes at the end of defendants' enumeration of the five programs of emphasis. Defendants state that "it's imperative that over the planning period, the Department upgrade the non-revenue sports scholarship base. Volleyball, women's basketball, and swimming will be funded and the balance of women's sports will be funded based on residency dollars." *Id.* at 8. Based upon the above evidence, it appears that defendants do not have any concrete plans to substantially expand its current programs for female athletes in the near future. Indeed, defendants stated in pre-trial interrogatories that CSU does not presently plan to add teams to its intercollegiate athletics program. Plaintiffs' Exhibit 21 at 10.

In summation, the Court notes that none of the major goals articulated in defendants' 1983 corrective action were ever attained. The Court also finds that over the last twelve years women have shouldered a disproportionate amount of the program contraction efforts at CSU. After a careful review of the statistics for the past twelve years and defendants' unattained program expansion goals for CSU, the Court concludes that CSU has not demonstrated a history and continuing practice of program expansion for women.

### 3. Full and Effective Accommodation Of Interests and Abilities

While it has already been determined that women are underrepresented among CSU's intercollegiate athletes, and that defendants cannot show a continuing practice of program expansion, defendants can still prevail in this lawsuit if they can demonstrate that the interests and abilities of women are being fully and effectively accommodated by CSU's present athletic program.

At trial, Jennifer Roberts and Aimee Rice Ainsworth testified persuasively about their dedication to the sport of softball, the amount of time they had invested throughout their lives in training for this sport, and tangible losses they are experiencing in not being able to play softball during the current academic year. This testimony was consistent with the testimony of Laura Bielak and Malia Kuenzli at the preliminary injunction hearing and with the affidavits submitted by the remaining plaintiffs. The testimony of Ms. Roberts and Ms. Rice Ainsworth indicated that CSU's women's softball team finished third in the Western Athletic Conference in 1992. In addition, plaintiff Stacie Stafford was named a Western Athletic Conference Softball Player of the Week in 1992. Ms. Roberts and Ms. Rice Ainsworth further testified that CSU freshwomen definitely are interested in fast-pitch softball, and have turned out in considerable numbers to participate in a softball club team. From the testimony presented at trial and the other evidence considered by this Court, it appears that CSU has eliminated varsity athletic opportunities for women in a sport where there is significant interest and talent.

It also appears to the Court that the popularity of women's softball at CSU is a reflection of the sport's growing popularity nationwide. According to Charles W. Rice, the Colorado Commissioner for the Colorado Amateur Softball Association, fast pitch softball is becoming an increasingly popular sport for girls in Colorado. *See* Plaintiffs' Exhibit 52. Figures provided by Mr. Rice indicate that high school competition in fast-pitch softball has increased from approximately 1,950 girls in 1980 to approximately 4,605 girls in 1992, an increase in participation of approximately 236 percent. *Id.* This increase in participation in Colorado is significant because Colorado high schools provide CSU with approximately 75% of its undergraduate student population. Defendants' Pre–Trial Brief at 17. In his affidavit, Mr. Rice also reports that 100% of female high school seniors participating in the Colorado All–Star Girls Fast–Pitch Softball League in the last four years have gone on to college. Finally, Mr. Rice points out that

women's fast-pitch softball will be a medal sport in the 1996 Summer Olympics.

■ The evidence provided by Mr. Rice, Ms. Roberts, Ms. Rice Ainsworth, and the other plaintiffs convinces the Court that a substantial number of current and future CSU female students are now or will be interested in the future in competing on women's varsity, club, and intramural softball teams. Accordingly, the Court finds that there is a strong present and future interest in retaining women's fast-pitch softball as a varsity sport at CSU. Considering the existing disparity between female and male varsity athletes and their respective enrollments, and the demonstrable interest in the varsity opportunities being eliminated, the Court concludes that the termination of these opportunities evidences a failure to accommodate the interests and abilities of women. However, the Court's inquiry as to whether the interests and abilities of women have been fully and effectively accommodated by CSU's athletic program goes beyond the demonstrated interest in women's softball. Are there other women students at CSU whose interests in additional athletic participation opportunities have not been fully and effectively accommodated?

In determining whether CSU is fully and effectively accommodating the interests and abilities of its athletes, the Court may consider the expressed interests of female students, whether there are sufficient numbers of athletes to form a team, and whether there is a reasonable expectation of intercollegiate competition for that team. *Cohen,* 809 F.Supp. at 992. The testimony of Mr. William Hall, CSU's Club Sports Coordinator, was illuminating with regard to these factors. Mr. Hall testified that he considered the women's soccer, women's lacrosse, women's rugby, women's volleyball, and women's alpine ski club teams to be competitive. According to Mr. Hall, the women's soccer team has expressed its interest in becoming a varsity sport. He added that the women's soccer club has played a competitive intercollegiate game schedule in past seasons. Defendants agree that women's soccer has a popularity level equal to or exceeding the women's fast-pitch softball club. Defendants' Pre–Trial

Brief at 20. Further, defendants imply in their brief that were resources not limited, there would be adequate numbers of interested women students at CSU to enable defendants to add varsity teams in women's lacrosse, women's soccer, women's junior varsity volleyball, and women's alpine skiing. *Id.* Further, Mr. Hall's testimony made clear the difference in benefits afforded to club sport participants and to varsity athletes. For example, Mr. Hall testified that CSU sponsors approximately 32 club sports teams with a total budget of approximately $70,000 dollars. This sum is less than half the amount allocated to the women's varsity softball team for the 1991–92 school year. *See* Plaintiffs' Exhibit 20. In addition, and unlike varsity athletes, club sports participants must pay dues, buy their own equipment, pay their own travel costs, and are not eligible for athletic scholarships.

The Court determines from the testimony of Mr. Hall and the defendants' own arguments that there are women athletes at CSU who are interested in and capable of playing on varsity teams other than those currently offered by CSU. Had CSU been searching for ways to expand varsity participation opportunities for women rather than reduce them, they would have had to look no further than CSU's club sports program. If, for example, CSU had added a 23 woman varsity soccer team during the 1992–93 school year to meet the demonstrated interest of female athletes, and had at the same time maintained its women's softball team, the female participation rate at CSU would have risen to approximately 44.3%. If, hypothetically, defendants had also added a women's varsity alpine ski racing team with 15 members, female participation would have risen to 46.-6%, leaving an acceptable 1.7% gap between female athletic participation and female undergraduate enrollment. *Id.* In determining the average participation figures for these two teams, the Court considered the *NCAA Gender–Equity Study* which was released in March of 1992. *See* Defendants' Exhibit BH at 9. Finally, the Court notes that there would be a reasonable expectation of intercollegiate competition for varsity teams such as women's soccer or alpine skiing given the fact that several schools within the Western Athletic Conference offer women's soccer and alpine ski teams.

The Court concludes that defendants have not met their burden of proving that they are fully and effectively accommodating the interests of women at CSU despite the under-representation of women in CSU athletics. The evidence introduced at trial shows that there are in fact women at CSU who are capable and desirous of competing in varsity sports other than those being currently offered. Plaintiffs' testimony at trial also demonstrated that there is a strong present and future interest in maintaining women's softball as a varsity sport at CSU. Thus, the Court finds that the demonstrated interests and abilities of both of these groups of female athletes are not being fully and effectively accommodated.

### 4. Other Findings

■ Mr. Corey Johnson and Ms. Roselyn Cutler testified at trial that the primary reason the women's softball team was eliminated was to reduce a budget shortfall in CSU's athletic department. However, a financial crisis cannot justify gender discrimination. *See Cook v. Colgate University,* 802 F.Supp. 737 (N.D.N.Y.1992); *Favia,* 812 F.Supp. at 583. Dr. Albert Yates, Mr. Johnson, and Ms. Cutler also testified that they did not intend to violate Title IX nor did they believe they were violating Title IX by their decision to cut the women's softball team. Although the Court finds that these three individuals discussed and considered Title IX before cutting the women's softball team, Title IX and the implementing regulations can be violated without a showing of specific intent to discriminate against women on the part of the decision makers for the educational institution. *See Haffer v. Temple University,* 678 F.Supp. 517, 540 (E.D.Pa.1987); *Favia,* 812 F.Supp. at 583. In other words, good intentions or a misinterpretation of the law does not negate a violation of Title IX.

### Conclusion

The Court concludes that defendants' decision to terminate the women's softball team constitutes a violation of Title IX, when

viewed in the context of CSU's disproportionate athletic participation rates for women, defendants' failure to demonstrate a history of program expansion for women, and defendants' failure to demonstrate effective accommodation of female students' interests and abilities. The underlying mandate of this opinion is that CSU may not continue to operate an intercollegiate athletic program that provides a disproportionate amount of participation opportunities to male athletes where there is no evidence of continuing program expansion or effective accommodation of the interests and abilities of its female students. Accordingly, a permanent injunction will issue in favor of plaintiffs and against defendants requiring defendants to reinstate the women's intercollegiate softball program and to provide the women's softball team with all of the incidental benefits accorded other varsity teams at CSU. It is thereby

ORDERED that a permanent injunction against defendants requiring them to reinstate the CSU women's softball team is hereby issued. It is

FURTHER ORDERED that the parties are to submit a status report on or before April 16, 1993.